And we will hear argument next in International Longshore and Warehouse Union against National Labor Relations Board. Robert Remar Petitioner, International Longshore and Warehouse Union v. ILWU The Board's decision here must be vacated because it fails to follow the dictates of this Court's decision in the Kinder Morgan case, where the Court held that our 2008 Longshore Work Preservation Automation Agreement constitutes a complete defense under Section 8B4D and Section 10K with respect specifically to work not previously performed by the Longshore Bargaining Unit, pursuant to the principles enunciated by the Supreme Court in the two ILA cases. I want to say, though, first off, that if this decision of the Board stands and the Board then is permitted to interfere with these work assignment, work preservation automation agreements, simply through its 10K process of declaring that an employer preference to the assignment that does not comply with the agreement is to be upheld, that completely frustrates these agreements. It completely undermines any reason for unions to negotiate and agree to these terms. And this is exactly the concern that the U.S. Supreme Court has stated several times, both in the ILA cases. This Court, in the Kinder Morgan case, also repeated that concern. And the result will be we won't have work preservation automation agreements anymore. We'll simply have intransigence. We'll have the workforce fighting every step of the way with respect to automation. The results will be an undermining of labor peace, an undermining of industrial stability, and a harm to national commerce, as well as in our industry, with ports, international commerce. It's exactly these concerns that has caused the U.S. Supreme Court, in these cases I've cited, to state that national labor policy is not just neutral about these special work preservation automation agreements. There is a preference, that's the word the Court uses, there's a preference for these types of agreements. So the ILA cases were Paragraph B cases involving secondary boycotts, right? Yes. Why is it appropriate to apply the form of the work preservation defense that obtains in that context in the D context of jurisdictional disputes? Firstly, because the Kinder Morgan Court says so. Okay, I mean, we can come back to that. You have a strong argument under Kinder Morgan, but as a matter of first principles, why does it make sense? Yes. It makes sense because the policy under AP4D and AP4B with respect to labor peace and with respect to honoring contractual commitments is the same. And this Court is not the first to apply those principles of AP4B to AP4D and 10K situations. We show in our reply brief that the NLRB General Counsel has for many years, and they're the gatekeeper of these types of charges, and they decide which ones get processed, which ones don't. For many years, their position has been that under the ILA and similar AP4B work preservation cases, that those principles apply in AP4D as a complete defense where there is, in fact, a valid lawful work preservation agreement in play. The case that we cite as an example of the General Counsel NLRB's position is a 2014 case, also in the longshore industry from the East Coast and involved Greenwich terminals. We cite that at page 14 of our reply brief footnote 5. So that's an example where it's been understood and the practice has been to apply consistent with what the Court did in Kinder Morgan AP4B case law. The other thing is that in our case, as well as in Kinder Morgan, the underlying board decisions also apply AP4B case law with respect to the analysis for charges involving AP4D. So the DC Circuit seems to have understood it differently in Sealand. Is your position consistent with that? Or maybe you think we already created a conflict with Sealand and Kinder Morgan, but can you address that? Yes. The Sealand case is not in conflict with Kinder Morgan. Sealand did not involve a work preservation automation agreement. It was not invoked. And Sealand also did not say anything about whether a work preservation automation agreement defense is disallowed under AP4D. What Sealand held is that when a union, and it was the ILWU, labels its work claim as work preservation, quote unquote, that that's not sufficient to then have application of the AP4B type principles for a defense under AP4D. Because the reality is that in the vast majority of cases, maybe not the vast majority, in many cases unions will, and I've done this for unions, we will label our position, our claim, as work preservation. But that's very, and that's what the Sealand case was about. That's very different than here where you have a specialized work preservation automation agreement designed to address major technical changes in an industry that's going to displace bargaining unit jobs. And the parties are looking for ways to offset that displacement. So you seem to take the position that work preservation defenses and jurisdictional disputes are mutually exclusive. Is that what you're arguing to us now? Not quite. What I'm arguing is that in a case like ours in Kinder Morgan, when there is a work preservation automation agreement that's specifically negotiated to address automation and anticipated displacement of jobs, that that is a defense. And Kinder Morgan does not need to be construed as being any broader than that. It can rest and be understood to concern the unique situation of our fact pattern, which is the work preservation automation agreement. And in fact, the board in the Kinder Morgan case had, in their brief to this court, had said that it is in rare instances, that's the phrase they used, rare instances where we actually see these work preservation automation type agreements. Is there any, or what is the role of analyzing whether this is primary or secondary? Simply not a factor? It is a factor in the sense that if there is a secondary objective, and therefore a secondary problem, then it's not going to be a valid work preservation agreement in the first place. And what Kinder Morgan says is that you look at the agreement, is this a valid, lawful work preservation agreement? If yes, is it being applied with respect to jobs that fall within the functional equivalent or traditional work patterns of the bargaining unit itself? The board tries to, in its decision, distinguish, oh wow, I have five seconds left, and I was about to get into a whole new area that's going to take a little bit longer than that. So maybe I'll rest here. All right. Thank you very much. Thank you very much, Your Honors. Good morning, Your Honor. May it please the Court. My name is Michael Keneally, and I represent PMA. I'd like to try to reserve three minutes for rebuttal. It's a fundamental goal of labor law to encourage employers and unions to settle their disagreements through collective bargaining. PMA normally sits across the bargaining table from the ILWU, but we're undermined the bargain that PMA and the ILWU struck in their contract. And not only that, the board's rulings commit the same errors that led the court to reverse the board in the Kinder Morgan case, another recent dispute involving PMA, the ILWU, and exactly the same contract provisions that are at issue here. The court should reverse here, too. I mean, so you struck a bargain with the ILWU, but you also struck a bargain with the machinists, right? And I mean, sort of the reason that we're here is that there's arguably a conflict between those two. So, I mean, isn't that sort of the classic case of a jurisdictional dispute under D? So just to clarify, PMA, my client, did not agree, but the member, SSAT, did. Sure. Fair enough. And I think that's an important difference, though, because we are dealing here, as Mr. McLaughlin said, with an unusual scenario where you have a multi-employer, coast-wide bargaining unit representing over 10,000 employees, over 60 companies, and they have a contract that covers shipping work throughout the whole West Coast industry. And that is no small thing, as I'm sure the court is aware, given how much of the nation's commerce goes through the West Coast ports. And then you have one member in that multi-employer bargaining unit who's bound by the contract that its bargaining agent, PMA, entered into with the ILWU that covers so many employers that has a separate agreement with a union that's just applicable to that employer. And, you know, in a different world, perhaps the board should, in its 10K proceedings, attempt to take account of the sort of mismatch in scale and scope between those two and ask whether the IAM has the similar sort of work preservation objectives that the ILWU here does. But the 10K proceeding isn't built for that. It considers very specifically who's been performing the specific work at issue. And in doing so, the board looks at some different factors. But what the board doesn't do is attempt to apply the ILA framework to ask whether the larger contract is going to be enforceable in an unfair labor practice at the end of the day. And maybe the board should do that. It certainly didn't do that here. I think that's why we got into this problem. So this is not a case like the Safeway Stores 10K decision that the board often cites, where a single employer has 100 percent control over its obligations to one union and yet tries to reassign the work to a different union. That's not this case. This case is a much more complicated case. And I think, respectfully, the board did not put in the thought and consideration that a case of this scope deserves. So if the board did apply the Safeway framework, which I gather you're arguing it did, is our best course or maybe only course to remand? No, Your Honor, I don't think there's any need to remand. Whether the Safeway framework were applied or not, because this Court has already tread this ground in Kinder Morgan. And it said there, in response to the same argument that the board is making in its brief here, that namely that AP4B cases like ILA don't apply to AP4D cases like we have here, the Court there didn't go down that road, and it's too late to do so now. Instead, the Court said, we're only going to standards, and under AP4D, the ILA framework is applicable. And I don't even hear the board arguing in its, or I didn't read the board arguing in its brief anyway, that under the ILA framework, the work preservation agreement here fails. Rather, they just say that the ILA framework doesn't apply. And frankly, there's not a whole lot of analysis in the board's decision about why that might be. You know, Judge Miller, you referred to the Sealand case from the D.C. Circuit. As Mr. Rimar was pointing out, there the ILWU's argument was different than it is here. It wasn't making the sort of work preservation ILA-style argument that it was making. It was making a sort of more run-of-the-mill work preservation argument. But the board didn't grapple with that distinction at all. It didn't fully understand, or didn't fully grapple with this Court's precedent in Kinder Morgan. And instead, it simply differentiated Kinder Morgan on pretty superficial grounds, I would submit, rather than attempting to fully explain why you would have totally different work preservation standards. And to go back to your question that you asked of Mr. Rimar, Judge Miller, I think that if the board were to have two different work preservation standards, as it's frankly arguing for here, it would be entirely confusing for contracting parties to figure out how to enter into these agreements. Because, of course, in some cases, you might be in a secondary boycott, A before B scenario. But it's also possible to end up, as we did here, with a single employer who's subject to multiple agreements that conflict. And if a multi-employer operation, like the ILWU-PMA bargaining, has to take into account all of the possible individualized collective bargaining agreements that every one of the 60-plus members could enter into, it would be chaos. And Mr. Rimar was saying the ILWU and similarly situated unions just wouldn't find these work preservation agreements to be valuable in the first place. And that you just had, if you didn't have PMA, you just had a single employer that has agreements with multiple unions. Do you think Kendra Morgan says that the ILA work preservation defense is the appropriate way, is the appropriate rule to apply even in a B4D? I don't read Kendra Morgan as really going that second step. I think the ILA cases themselves were multi-employer cases. And I haven't, you know, scoured the reports looking for attempts to apply ILA work preservation principles to a single employer bargaining unit. So I don't know how that would play out. I think it would be harder to make out an ILA defense in that scenario. And so I don't read the court's decision in Kendra Morgan as necessarily going that step further. I think here, the case for just applying Kendra Morgan is especially strong because we're dealing with the same contract and mostly the same parties, not entirely the same parties. I wanted to reserve three minutes. Yes, I'd like to reserve three minutes. Thank you. Good morning, David Rosenfeld on behalf of the IAM. I'd like to reserve five minutes of rebuttal, but respectfully request that I have a couple of minutes to the end, because although we're the petitioner attacking the Board's remedy, we're also really responding to both the Board and the ILWU and the PMA. Your Honor, I think we, I think our order, our order contemplated that after the Board, you'll go and then the PMA will go at the end. I understood that. All right. So there have only been three cases in this Court dealing with 8B, 4D, 10K cases. One of them was mine more than 20 years ago involving the machinists, where the SSA, the same employer, awarded reefer work to ILWU mechanics at the Howard Terminal, and we protested. At that point, SSA awarded that reefer work to IAM members, and the Board heard that and said, this isn't a jurisdictional dispute. SSA created the problem by taking work that was historically performed reefer work at the Howard Terminal, taking it away from ILWU members, and assigning it to IAM members, and said this wasn't a jurisdictional dispute. In RECON, with the bricklayers, the same result. RECON took work that the I, that the bricklayers had historically performed in construction, and took it away from them, assigned it to a different union, and the Board said, this isn't a jurisdictional dispute. RECON, you created the problem. So there's a substantial difference between 8B, 4D and 8B, 4B, and the D.C. Circuit answered Your Honor's question in Sealand at 1412, where it points out the difference and, in fact, responds to the arguments that the ILA case, because it cites the ILA case, and says that does not apply in an 8B, 4D setting. But I want to go back to first principle here, because Mr. Remar talks about contracts. Remember that the IAM contract with SSA governing this work is as broad as the ILWU contract. It's at Article V, at the Board's Extroverture Records, page 177 of IAM 3. The employer agrees that any future work created by advancements in technology, or changes in existing technology necessary to perform NMAR work will continue to be performed by the employees covered by this agreement, including but not limited to technology and automation. So that's a traditional jurisdictional dispute. SSA has IAM mechanics performing work in Seattle, and assigns the work at Terminals 18 and 30 to us. Terminal 5 is next door. The ILWU has a contract which equally governs the work. I concede it. We both claim work that's due to automation. So that's the traditional jurisdictional dispute where they're contracts, covering work, and the employer makes a decision one way or the other, and then the Board is empowered to resolve it. And I think it's important to note that that's what happened here, is that the ILWU stipulated when the 10K hearing came that this was a traditional jurisdictional dispute, and maintained that position. And although not in the excerpt, Joint Exhibit 86, which is in the record, which is the ILWU's brief to the Board, says, in that case, referring to my earlier machinist case, which I lost, and this Court affirmed the loss, says, in that case, the Board granted the motion to quash the notice of 10K because the work had historically been performed by ILWU until SSA unilaterally reassigned IAM. Therefore, Section 10K did not empower the Board to resolve the dispute. And then the ILWU goes on to tell the Board, here, by contrast, no party has moved to quash the notice of 10K hearing, and there's no dispute that Section 10K empowers the Board to award the work at issue. Therefore, the Board should follow its practice of maintaining the status quo and awarding the work to the employer's assignment, which is ILWU. So they maintain throughout the 10K that this was a traditional jurisdictional dispute, two contracts, two unions, wanting to do the same work, the Terminal 5 M&R work. Roberts. So all of that would be — that's all fine, but then we have Kinder Morgan. What do we do with Kinder Morgan? Levin. Well, in part, you wait to Mr. Jost to explain that. But I'll answer it in one way that I think the Board doesn't fully — that the Board rules upon that I think is more critical, at least I think is more persuasive and is an easier way to distinguish it. And sort of — what happened here was that ILWU stipulated it was a traditional 10K, litigated for three days, wrote briefs. The Board awarded the work after the ILWU stipulated it, awarded the work to the IAM, which I suspect was a surprise to them and, frankly, a little bit to me, because normally employer preference governs. But the Board found that Ed DeNike would have used IAM mechanics for a lot of reasons. And at that point, the ILWU raises work preservation by filing a grievance seeking a penalty against SSA. So at that point, they seek a penalty. And the arbitrator says, you don't get the work back. I'm just going to pose this penalty of pay in lieu on SSA if they don't give you the work back. So what the Board says in its decision, that there are repeated cases holding that employers cannot undermine Board 10K decisions by — or unions can't, the ILWU can't — by filing a grievance seeking a penalty against an employer that lawfully complies with a 10K. So this arises under what the Board says unusual circumstances where you have a 10K awarding the work to our members to do the M&R work, and then suddenly the ILWU changes its tune and files a grievance seeking a penalty because SSA did not express an explicit preference. So the Board says this is different. So I think that's an easy — it's not easy. It's a reasonable way to understand that the procedural posture of this case was that the unlawful conduct of the ILWU was filing a grievance seeking a penalty after the Board had awarded the work to us because the ILWU stipulated that was appropriate. Kagan. Why is the procedural posture determinative of which work preservation defense applies? Levin. For a couple of reasons. First of all, that's sort of waver and estoppel. But RECON, I think, answers the question. So you remember in RECON, the matter was a matter of assignment, just as it was in my older IM case involving Howard and Termel. And what this Court said in RECON was that there are three factors the Board looks at initially to decide even whether there's a jurisdictional dispute. Is there a method of resolution? But it goes on to say — and I think this is critical in answering your question, Judge Rosenthal — that there are unusual circumstances where employers take work from one union and give it to another and create the dispute. And in RECON, that's what happened. And they said the Board was correct that that's not a traditional jurisdictional dispute. That's been the law for a long time. It was the law in my SSA case that I fought with the ILWU. So what the Board says is that that is not a traditional and RECON agrees, and I think that's the distinction here. So the Court has already ruled on that. You're down to two minutes. I'll reserve time. Thank you very much. And we will hear from the Board. May it please the Court. My name is Micah Jost for the Labor Board. I want to thank the Court for its indulgence in allowing me to appear remotely today. I'd like to begin by observing two things that I did not hear from ILWU or PMA and then addressing the one I did hear. The two things I did not hear were, one, any case applying secondary boycott work preservation theories in a pure jurisdictional dispute where no secondary boycott was alleged. They cited no such case. There's none in the briefs. There's none at argument today. They referred to an advice memo in footnote five of their ILWU reply brief. That's not a binding document. And in any event, if you read it closely, you'll see that they applied two different theories there, one to the D, one to the B. But the other thing I did not hear today was any explanation for why it would make sense to apply a theory that asks whether action was primary or secondary to apply that theory in a case where that question is not presented and why that would defeat the existence of a jurisdictional dispute. And indeed, it shouldn't because nearly all jurisdictional disputes are primary. If showing that it is primary defeats the jurisdictional dispute, the Board has nothing less to do under 10K. The argument I want to respond to that I heard was that the work preservation agreement here that ILWU and PMA have is especially important because it deals with automation. That is an argument that absolutely can be raised and was raised in this case in the section 10K proceeding. Again, if you look at Joint Appendix, excuse me, Joint Exhibit 86, that's the brief that ILWU filed. They argued that the Board takes that into account. The Board has taken that into account in a case that ILWU cites in their opening brief at page 10, American Mail Lines, which is from 1963. The Board engaged in exactly that sort of analysis. It looked at the weight of a contract that deals with automation across a multi-employer bargaining unit. It said, this is especially important. We are going to give weight to that one over a conflicting agreement. But that does not mean that there is no jurisdictional dispute. Here, ILWU and PMA are not arguing that the Board's 10K decision needs to be vacated on that basis because it didn't give enough weight. Instead, they're arguing this matter of the Board's inference of a preference. I can address that if the Court has any questions on that front. But otherwise, I'll move into Kinder Morgan because I understand that is the key question that this panel has to deal with. We certainly recognize that the decision of a prior panel is binding on this Court. But I want to emphasize that Kinder Morgan is not the only prior decision of this Court that this panel is bound to apply. RECON and USCP-WESCO are pre-Kinder Morgan published decisions of this Court that uphold the Board's work preservation standard in a case that does not involve a secondary boycott, which is what this case is. In RECON from 2005, at page 989 of that decision, the Court, quote, adopted the Board's Section 8B4D Safeway Stores work preservation standard. And for that standard, it cited Shepard exposition, which is a 2002 Board decision, which explicitly said that a showing of work preservation under Section 8B4D, quote, requires a showing that one union was previously performing particular work and that the employer reassigned it. That language does not leave room for some alternative work preservation theory that deals with secondary boycotts in order to answer that same question. The fundamental inquiry, and that's a quote from Kinder Morgan, the fundamental inquiry that the was whether ILWU's objectives were primary or secondary, and no one disputes that that question is not presented here. Kinder Morgan did not and could not overrule RECON, and this Court's task is to reconcile and harmonize the binding precedence of prior panels. In a case that involves the same statutory provision, Section 8B4D, and does not involve secondary boycott allegations, RECON is the binding authority that this Court needs to apply. It is, of course, also consistent with the D.C. Circuit's decision in Sealand, which clearly addresses this issue. I heard opposing counsel... The problem with that reading of Kinder Morgan is that there were secondary boycott allegations at issue in the case, but as I read what we said about the jurisdictional dispute there involved applying the ILA standard, which is the secondary boycott work preservation defense, but we applied that in Kinder Morgan in the context of the jurisdictional dispute. So, I mean, maybe the Court was confused. It's a little confusing that there are two different work preservation defenses that apply in different contexts and have the same name, but as I read the opinion, it seems like that's the one that they were applying. So, how do we get around that? I acknowledge the Court said that it was applying the same analysis under both provisions, and I don't want to suggest that the Court is at fault for any mistake here, but I would simply point out that when... That was my suggestion, not yours. Well, when the case was litigated, Your Honor, in the Section 10-K, the ILWU at that stage argued Safeway Stores work preservation, and that is the theory that the Board resolved in the 2011 Kinder Morgan decision. It was completely clear about that. Safeway Stores, 10-K, AB 4-D, nobody said anything about ILA at that stage. When the case went to the ALJ and the B allegations, B as in boy, for secondary boycott had been added in. At that point, the ALJ analyzed them both under the same ILA national woodwork theory, which asks whether it's secondary or not, and the Board did not clearly differentiate between those two in its decision at that point, and the Court took the decision as it had been presented to the panel in that case, and it simply applied them to both as the Board had done. I would suggest that in a future case that presents both statutory provisions, both issues, it would be appropriate for the Board to clarify its law to address what does happen when you have both theories, but that issue is not presented here because we only have one provision, and it's clear what the defense is that applies under D. The Court in Kinder Morgan did not have a statutory context before it in which only one wood preservation theory was appropriate. It was appropriate for the Court in Kinder Morgan to dispose of the secondary boycott question. It was appropriate for the Court there to apply national woodwork and ILA, and I would submit that it did so in an overbroad manner, but in this case, again, that issue is not raised. I do want to note that there are multiple cases which recognize, including from this Court, that the two defenses are not coextensive. So in USCP Wesco, where there was a work preservation dispute under Section 8b4d, at the end of the decision, after upholding the Board's finding that it was a work preservation dispute, the Court said, nonetheless, Safeway is not without a remedy here because they can still file 8b4b charges against the individuals who were attempting to picket. So that recognizes that disposing of one does not dispose of the other, and again, that is binding authority for this Court. A similar dynamic is present in Alaska Timber, which is a D.C. Circuit case that we cited from 1986. There, the Board had found violations under both D and B, and the D.C. Circuit reversed as to the D. It found, no, this was not a jurisdictional dispute where a party could be precluded from using economic pressure to force reassignment of the work. Instead, it was a work preservation dispute under the Safeway Stores framework, but in spite of that, it upheld the Board's finding of a B violation, finding that there was a secondary boycott because there was action against a neutral employer. And so those two cases illustrate and demonstrate that the analyses are not interchangeable, they're not coextensive, and in a case where only one of those issues is presented, we all know what theory should apply, and it's Safeway Stores, which the analysis that actually answers the question that is posed, and the question that is posed under D, is whether the employer is entitled to the Board's processes to resolve a dispute that it is facing between two unions. I want to also emphasize that ILWU, I think, has recognized this in the past. It has argued Safeway Stores work preservation, even though it's had this contract in place since 1978, guaranteeing it the MNR work. Going back even farther to the pre, even back to, I think, the American Mail Line case, they've been preserving work against containerization and other automation. But ILWU has raised Safeway Stores work preservation in the 2007 case that this court dealt with with IAM, which Mr. Rosenfeld referenced. They argued it there, they argued it again in the Kinder Morgan 10k case, and they argued it most recently in a 2024 Board case, which I think has been referred to as the cold ironing case, which is 373 NLRB number 39. That is a case where the Board considered and rejected a Safeway Stores work preservation theory, but it ultimately awarded the work to ILWU. So I hear ILWU and PMA protesting that their contract will be undone, that they will lose the benefit of their bargain, and that everything on the West Coast will fall apart if their theory of work preservation isn't extended into a new context where it makes no sense. But the reality is that they have ways of prevailing in Section 10k cases, as they did in the cold ironing case, as they have done in other cases. And even if they do not prevail in every single case, these jurisdictional disputes do not constantly arise under their contract, because not every employer has pre-existing obligations to another union under a contract. Here, SSAT is one of the few employers that has agreements dating back to the 1940s and the 1960s with IAM to perform this work, and IAM is the union that has the prior claim on that work based on those contracts. And in limited circumstances where, for example, a new facility is opened or a vacated facility is reopened, there may be a jurisdictional dispute for the board to resolve, but that does not completely deprive ILWU or PMA of the overall effort that they are trying to engage in here. It simply recognizes that Congress imposed limits on what a union and an employer can agree to when another union is involved and when the employer faces conflicting, irreconcilable demands from two different unions. In Section 10k and Section 8b4d, Congress authorized the board to resolve those disputes and relieve the employer that finds itself caught in the middle. Is there any role in your analysis for the unique nature, arguably, of technological displacement disputes? I think that's what I was getting at, Your Honor, with the American Mail Line case, that, yes, that is absolutely something that ILWU is entitled to raise in the 10k. It is entitled to argue that its contract is more powerful, is more weighty, and that industry practice favors it for all of those reasons. If the board rejects that argument and the case goes to court, the ILWU can make its argument at that stage. But what it's arguing is that there's something unique and special from a legal perspective about these agreements and that, for some reason, when a work preservation agreement deals with automation, suddenly you can draw on secondary boycott principles that are otherwise unavailable. There's simply no basis for that. There's no basis. I want to emphasize in that regard that the ILA theory, the work preservation theory, based on automation, is simply a subset of national woodwork. National woodwork recognizes that when a union has traditionally performed the work and when the employer has control over who gets that work, those are the two things that demonstrate a primary motive. The ILA cases simply recognize that you don't have to have traditionally performed the precise work if it is being displaced or moved. You can demonstrate a functional equivalent. So it essentially provides another way of satisfying that secondary boycott test, but it does not supplant, it does not replace, and it is not interchangeable with the fundamental question of whether the employer instigated dispute, whether it is entitled to take responsibility. I'll just emphasize again as a matter of policy that, while the other side lays out a parade of horribles, if their contract is not enforced in a way that overcomes jurisdictional dispute case law, on our side, I would submit that if ILA and national woodwork are extended as a defense into the D context, that it will essentially undo the board's ability to actually resolve these disputes because in nearly every one of these disputes, the parties are undisputedly primary or engaged in activity against a primary employer. And so it's essential for industrial stability that the court continue to apply the distinction that the board has recognized and that this court has upheld for 60 years. So I'm happy to take any further questions if the court has any, but otherwise I'll... It appears we do not. So thank you, Your Honor, and we would simply ask for enforcement of the board's order in full. Thank you for your time. Thank you. All right, Mr. Rosenfeld. I have two minutes and it's difficult to rebut because Mr. Joe's answers were in line with ours. I would just emphasize a couple things he said that he's right that the theory of the ILWU and PMA would undo 10Ks, and I've probably done as many 10Ks as anybody around over the years, but I've always advised clients, you look at employer preference. If the work is given to the other union, don't bother, you lose. This was an unusual case. We ended up litigating it, and the board ruled in our favor. And he's right that if you look, if you allow the contracts to govern, every dispute will involve work that's fairly claimable by one union and both unions. So had that happened in this case, both unions would have been free to say, it's our work, we get to strike over it, and that's exactly what 10K is designed to avoid. This isn't a secondary boycott problem because the dispute wholly involved SSA, the largest terminal operator on the West Coast, terminals up and down the coast. Many are ILWU totally. Every terminal that SSA operates hires ILWU longshore workers to load and unload the ships. But in Oakland, in Seattle, IAM mechanics and in Los Angeles represent mechanics in some terminals. That's the way it's been historically. So this was a jurisdictional dispute because it was a new terminal. I just want to conclude by a sort of important fact here that what caused this dispute was SSA decides to reopen the terminal where we had done the work historically, but I don't think that's relevant, and shuffled lines around, which happens all the time. And the fact is that Mattson Line was calling it Terminal 30 where we maintained the equipment. What caused this dispute was then Mattson was moved to Terminal 5. We wanted to our work of maintaining the work at Terminal 5, and the employer testified, essentially, that that made more sense. So it was a jurisdictional dispute. Thank you.  Mr. Jost argued that the theory of work preservation spelled out in ILA shouldn't be extended to the 8B4D context, but it already has been in Kinder Morgan just a few years ago by this Court. And nothing in Kinder Morgan is inconsistent with recon refractory or other Ninth Circuit cases. This Court addressed recon refractory multiple times in Kinder Morgan. And Your Honors are as familiar with Miller v. Gami as I am, but this Court has no power as a panel to overrule the panel decision in Kinder Morgan, and I don't see how you could adopt the Board's theory here without doing that. What is left? I mean, if we read Kinder Morgan that way, what is left of the Board's authority to resolve jurisdictional disputes? Because it's always going to be with respect to one of the unions a primary, isn't it? With respect to one of the unions? Well, or both of them. I mean, like it's, you know, the parties to the jurisdictional dispute are trying to preserve work that they've performed, right? So if that's the test, it seems like there's a mismatch between that version of the work preservation defense and jurisdictional disputes. Well, I don't think so, Your Honor. Recon refractory says that just because the 10-K process might not be available, that doesn't mean contract remedies are off the table. And again, Mr. Joseph was suggesting that the 10-K process can and should and does take account of the relative importance of the contracts. That's certainly not what happened here. In our case, the hearing officer, the NLRB members in the 10-K decision said that they weren't going to consider the fact that the employer assigned the work to the ILWU workers rather than the IAM because it was required by the PMA contract. Well, that's just the opposite of what Mr. Joseph was suggesting should happen when one contract is much more significant and important than the other. So I don't think that the 10-K decision process can carry the weight that the NLRB was suggesting that it should. Mr. Joseph also said that maybe the board should clarify its law. Well, that's not, to me, a strong argument for setting aside Kinder Morgan. There's not a single NLRB decision that I was able to find where this distinction of the ILA test of work preservation versus the Safeway Stores test or any other test provides a clear way of distinguishing D claims from B claims. In fact, here, the ALJ relied on the ILA test in addressing the claims at issue here. It just misapplied the ILA test by not looking at the broader array of work. So if this area of the law is a muddle, I submit that it is the NLRB's responsibility to sort out. But they haven't done that here, and I don't see how this court can do so consistent with Kinder Morgan. All right. Thank you. We thank all counsel for their helpful arguments in this case. The case is submitted, and we are adjourned.
judges: THOMAS, MILLER, Rosenthal